IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROMAYNE O. JACKSON, | ) |
| Plaintiff, | ) |
| v. | ) Civ. No. 03-1031-SLR |
| FIRST CORRECTIONAL MEDICAL SERVICES a/k/a First Correctional, WARDEN THOMAS CARROLL, and COMMISSIONER STANLEY TAYLOR, | ) |
| Defendants. | ) |

Romayne O. Jackson, Delaware Correctional Center, Smyrna, Delaware. Plaintiff Pro Se.

Susan D. Mack, Deputy Attorney General, Wilmington, Delaware. Counsel for State Defendants.

Daniel L. McKentry, Esquire, Wilmington, Delaware. Counsel for Defendant First Correctional.

**MEMORANDUM OPINION**

Dated: August 4, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

I. INTRODUCTION

Plaintiff Romayne O. Jackson, presently incarcerated at Delaware Correctional Center ("DCC") in Smyrna, Delaware, filed this action on November 12, 2003, against First Correctional Medical Services ("FCM"), Warden Thomas Carroll, and Delaware Department of Correction Commissioner Stanley Taylor. (D.I. 2) Plaintiff alleges constitutional violations arising from defendants' alleged failure to provide adequate medical care for his chronic ear problems, pursuant to 42 U.S.C. § 1983. (Id.) The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331. Currently before the court is plaintiff's motion for appointment of counsel. (D.I. 58) Also before the court is defendant FCM's motion to dismiss for failure to state a claim upon which relief can be granted and its motion to stay discovery pending resolution of its motion to dismiss. (D.I. 59, 86) For the reasons that follow, FCM's motion to dismiss is granted in part and denied in part and its motion to stay discovery is denied as moot. Plaintiff's motion for appointment of counsel is denied.[1]

---

[1] The court had successfully referred plaintiff to the federal panel for representation. However, plaintiff terminated that representation. In recognizing that termination, the court stated that it would make no further efforts to find voluntary counsel for plaintiff. Therefore, plaintiff's motion for appointment of counsel is denied.

## II. BACKGROUND

On October 26, 2001, plaintiff was incarcerated at the Sussex Correctional Institution ("SCI") in Georgetown, Delaware. When examined by the receiving nurse, plaintiff complained of ringing in his ears. (D.I. 2 at 5) The nurse scheduled plaintiff to see a doctor. (Id.) On October 29, plaintiff was seen by Dr. Burns and diagnosed with ruptured ear drums. Dr. Burns issued plaintiff earplugs, medication and a memo stating that plaintiff be permitted to wear the earplugs in the shower. (D.I. 2 at 10)

On November 8, 2001, plaintiff filed a grievance alleging his medication was improperly administered. Plaintiff alleges the nurse gave him the wrong medication, because the color of the pill was not the usual color and he awoke with a loud "humming" sound in his ears. (Id. at 12) The grievance was resolved and stated that plaintiff should not take medication that is "unusual." (Id. at 11) At a followup examination, Dr. Burns stated that the infection had cleared up despite plaintiff's complaints that he was still experiencing discharge, pain, ringing, and dizziness. No other medication was prescribed. (Id. at 5)

Plaintiff alleges that from December 3, 2001 through July 2002, he filed numerous sick calls and grievances but received no treatment for his ears. (Id.) Plaintiff was transferred to DCC

on July 8, 2002 where, upon intake, plaintiff's earplugs were confiscated despite plaintiff's production of the memo from Dr. Burns. (Id.) In August 2002, plaintiff submitted another sick call slip and was seen by the medical department. Plaintiff alleges that no examination was conducted and he was told that earplugs were unavailable. (Id. at 6) Plaintiff alleges that from August 2002 through December 2002, he continued to complain about his ear problems, but never received a proper medical examination. (Id.)

In January 2003, plaintiff was taken to a doctor outside the prison, Dr. Berg. (Id.) Dr. Berg ordered a C.A.T. scan and scheduled a followup visit to discuss the results. (Id.) Plaintiff received the C.A.T. scan in February of 2003. (Id.)

Plaintiff was transferred to SCI on April 11, 2003, where he informed the receiving room nurse that his symptoms had worsened and that he was supposed to see Dr. Berg for a followup examination. (Id.) Plaintiff was seen by Dr. Burns at SCI; he informed Dr. Burns that he needed to see Dr. Berg again. (Id. at 7) A week later, plaintiff received a special needs memo from Dr. Burns stating that plaintiff was to be given earplugs and must wear them in the shower. (Id. at 16) On April 29, plaintiff was again seen by Dr. Burns who verified his loss of hearing. (Id. at 7)

On May 20, 2003, plaintiff was transferred to DCC where his earplugs were again confiscated. (Id.) On June 10, 2003, plaintiff was seen by Dr. Armburo and was allegedly told there was "nothing wrong with his ears." (Id.) On August 27, plaintiff submitted another sick call slip complaining of pain. (Id.) On August 30, plaintiff received a response to his grievance, which stated plaintiff had been scheduled to see medical personnel. (Id. at 18)

In September 2003, plaintiff was seen by numerous nurses but alleges nothing was done about his grievances or his followup appointment with Dr. Berg. (Id. at 8) Plaintiff was seen by Dr. Tatagari on October 31, 2003 and given antibiotics, which he received on November 3, 2003. (Id.) Plaintiff was seen by Dr. Traveti on November 11, 2003, who prescribed earplugs which plaintiff never received. (Id.)

Twelve months after his initial visit, plaintiff was permitted a followup examination with Dr. Berg on December 12, 2003. At this appointment, Dr. Berg was unable to conduct the examination because prison officials failed to send the films and results of the January 2003 C.A.T. scan. (Id.) On December 30, 2003, plaintiff was informed that Dr. Alie refused to permit him to have the earplugs prescribed by Dr. Traveti. (Id. at 29)

Plaintiff was seen on January 12, 2004 by Dr. Howard. Dr. Howard diagnosed plaintiff with an ear infection, recommended the

4

use of earplugs, and prescribed nasal spray and eardrops. A followup appointment was recommended. (D.I. 12 at 2) Between January 13, 2004 and January 16, 2004, plaintiff alleges he was not given medication as prescribed by Dr. Howard. (Id.) Plaintiff also alleges that on January 17, 2004, he learned that Dr. Alie altered Dr. Howard's orders, substituting oral medication for nose spray, contrary to Dr. Howard's express guidance. (Id.) Despite a medication call on January 17, plaintiff did not receive the prescribed eardrops until January 23, and did not receive earplugs or nose spray. (Id. at 3) On January 25, plaintiff reported that discharge was no longer present, but he still experienced pain and ringing. (Id. at 4)

    Plaintiff experienced increased amounts of pain in his ears and, as a result, was housed at First Correctional Medical hospital from February 6, 2004 through February 18, 2004. At the hospital, he was seen by doctors, given antibiotics, nasal spray, and eardrops. (D.I. 16 at 1) On February 18, 2004, plaintiff was transferred to the Security Housing Unit and alleges he did not receive eardrops until February 25, 2004. (Id. at 2) Plaintiff was informed that he had not been given nasal spray because the prescribed brand was not available.

    Plaintiff had a follow-up appointment with Dr. Howard on March 1, 2004. Dr. Howard allegedly stated that nasal spray should be administered more often, and that earplugs were a

5

necessity. (D.I. 22 at 2) Dr. Howard also allegedly stated that he had scheduled plaintiff for a hearing test which plaintiff failed to attend. Plaintiff alleges he was unaware of a scheduled hearing test. The C.A.T. scan results needed for a complete examination were not made available for Dr. Howard. (<u>Id.</u>) Plaintiff continued to receive regular treatment of eardrops, nasal spray, and Motrin throughout the month of March. (<u>Id.</u> at 3)

On April 12, 2004, plaintiff was informed that he was awaiting approval for earplugs and a hearing test, and was given cotton balls in the meantime. (D.I. 25 at 1) Plaintiff received no response to his grievance concerning the C.A.T. scan films which were never delivered to Dr. Berg or Dr. Howard. (<u>Id.</u>) On April 25, 2004, plaintiff sent in a sick call slip complaining about discharge and pain but was not called for an examination. (<u>Id.</u> at 2)

On May 4, 2004, plaintiff was seen by Dr. Brown who prescribed the same eardrops that Dr. Howard had previously prescribed because the infection had returned. (D.I. 30 at 1) Dr. Brown was not sure why the earplugs had not been approved and, plaintiff alleges, she stated that the infection may not have returned if plaintiff had used earplugs while showering. (<u>Id.</u>) Plaintiff received earplugs later that day. (<u>Id.</u>) On May 10, 2004, plaintiff alleges a nurse gave him the wrong eardrops

6

because they caused burning and, therefore, could not be the same drops prescribed by Dr. Howard. (Id.) Later on May 10, plaintiff received different eardrops and experienced no discomfort. (Id. at 2)

From June 1, 2004 through June 18, 2004, plaintiff received Sudafed and nasal spray, although he alleges there were days when the nasal spray was not given to him. (D.I. 31 at 1) On June 18, plaintiff was seen by Dr. Brown who stated that the infection in his ears had returned, causing sinus headaches. (Id.) Dr. Brown prescribed eardrops and told plaintiff that he had been approved for a hearing test. (Id.) On June 23, plaintiff was taken to Dr. Howard's office where he was given a hearing test. To date, plaintiff is unaware of any recommendation by Dr. Howard following the test. (Id.) Plaintiff continued to receive nasal spray, eardrops, and antibiotics throughout the month of June, although he alleges there were days when the eardrops or nasal spray were not available. (Id.) Plaintiff alleges that he has sustained permanent loss of hearing which could have been avoided had he received proper medical attention. (D.I. 2 at 9)

### III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage

Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally. See Haines v. Kerner, 404 U.S. 519, 520-521 (1972); Gibbs v. Roman, 116 F.3d 83, 86 n.6 (3d Cir. 1997); Urrutia v. Harrisburg County Police Dep't., 91 F.3d 451, 456 (3d Cir. 1996). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV. DISCUSSION

FCM contends that plaintiff has failed to state a claim under § 1983 because he has not alleged a policy or custom. It is an established principle that the doctrine of respondeat superior is not an acceptable basis for liability under 42 U.S.C. § 1983. See Monell v. Dep't of Social Servs., 436 U.S. 658 (1978); see also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Swan v. Daniels, 923 F. Supp. 626, 633 (D. Del. 1995)

(applying this principle to liability of private corporations that provide medical services for the State). In order for FCM to be liable, plaintiff must show that it has a "policy" or "custom" that resulted in the alleged deliberate indifference to plaintiff's serious medical need. See Monell, 436 U.S. at 694.

A policy can be established when a "'decisionmaker possess[ing] final authority to establish [a] policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). A "policymaker" is the person who, under state law, has "final, unreviewable discretion to make a decision or take an action." Andrews, 895 F.2d at 1481. A custom is a course of conduct, "'[that is] so permanent and well settled' as to virtually constitute law." Id. at 1480 (citing Monell, 436 U.S. at 690)). A policy or custom may exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of the existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Id. at 584 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 309 (1989)).

9

In the case at bar, plaintiff has alleged that there is a policy that resulted in officials being deliberately indifferent to his serious medical need. Plaintiff alleges a continuous pattern of his medical treatment being delayed for non-medical reasons, a policy that fails to address the immediate needs of inmates with serious medical conditions. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 583 (3d Cir. 2003) (holding that Prison Health Services could be liable under § 1983 for the failure to have an adequate policy for addressing inmates serious medical needs). Furthermore, plaintiff's allegations suggest the absence of basic policies to insure that the medical orders of treating physicians are reasonably followed and that the medical orders of physicians are reasonably transmitted. Alleging the absence of such policies is tantamount to alleging that treating physicians are unable to exercise informed professional judgment, and that such inability resulting in their being deliberately indifferent to his serious medical need. Therefore, FCM's motion to dismiss for failure to state a claim is denied as to plaintiff's § 1983 claims.[2]

---

[2] FCM's motion is granted as to plaintiff's state law medical malpractice claims because plaintiff did not attach an affidavit of merit to his complaint as required by state law. See Del. Code Ann. tit. 18 §6853.

10

VI. CONCLUSION

For the reasons stated, the court shall deny plaintiff's motion for representation by counsel (D.I. 58) and grant in part and deny in part FCM's motion to dismiss. (D.I. 59) An appropriate order shall issue.