## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROMAYNE O. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 03-1031-SLR |
| | ) |
| THOMAS CARROLL and | ) |
| STANLEY TAYLOR, | ) |
| | ) |
| Defendants. | ) |

Raymond N. Scott, Jr., Esquire of Fish & Richardson, P.C., Wilmington, Delaware. Counsel for Plaintiff.

Catherine Damavandi, Deputy Attorney General, State of Delaware. Wilmington, Delaware. Counsel for Defendants.

## MEMORANDUM OPINION

Dated: August 5, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Romayne O. Jackson filed this 42 U.S.C. § 1983 action on November 12, 2003, alleging that defendants Thomas Carroll ("Carroll"), Stanley Taylor ("Taylor") and First Correctional Medical Services ("FCM")[1] provided inadequate medical treatment for his chronic ear problems and were deliberately indifferent to serious medical needs in violation of the Eighth Amendment of the United States Constitution.[2] (D.I. 2) In response, defendants Carroll and Taylor ("defendants") moved to dismiss the complaint.[3] (D.I. 20) On July 27, 2004, the court granted defendants' motion for summary judgment with respect to the claims against defendants in their official capacities, denied summary judgment as to the claims against them in their individual capacities and denied summary judgment "insofar as plaintiff has succeed in stating a claim." (D.I. 32, 33) Defendants filed their answer to the complaint and the exchange of pre-trial discovery commenced. (D.I. 75, 78, 79, 80, 81, 92, 93, 95, 97, 98)

Defendants Carroll, Taylor and FCM moved again for summary judgment. (D.I.

---

[1]At the time the complaint was filed, Carroll was the warden of the Delaware Correctional Center ("DCC"), recently renamed the James T. Vaughn Correctional Center, Taylor was the Delaware Commissioner of Correction and FCM was the medical provider for the Delaware Department of Correction ("DOC"). (D.I. 163)

[2]Although plaintiff initiated this action pro se, the court referred representation of plaintiff to the Federal Civil Panel following the court's decision to deny summary judgment. (D.I. 32, 33, 34) On November 16, 2004, counsel entered his appearance on behalf of plaintiff. (D.I. 44) Plaintiff terminated the representation of counsel and moved for the appointment of substitute counsel. (D.I. 58) The court denied the motion and noted that it would make no further efforts to find voluntary counsel for plaintiff at that time. (D.I. 87 at n.1) Plaintiff resumed prosecution of the action, pro se.

[3]Defendant FCM likewise moved, separately, to dismiss the complaint. (D.I. 59) The motion was denied on August 4, 2005. (D.I. 87)

100, 102)  On March 28, 2006. the court denied the motions for summary judgment and

referred the matter to the court's pro se law clerk to prepare the record for trial.  (D.I.

107)  Significant to the matters pending at bar, the court ruled the following:

> It is evident from the record that defendants cannot be held liable based
> on the doctrine of respondeat superior.  Defendant FCM is a business
> entity and, therefore, cannot be "personally" involved.  Plaintiff has
> admitted in his deposition that defendants Carroll and Taylor had no
> personal knowledge of his medical problems.
> Although defendants cannot be held liable under the doctrine of
> respondeat superior, they can be held liable for a policy or custom that
> demonstrates deliberate indifference.

(D.I. 107 at 4-5) (citations omitted)

On May 31, 2006, FMC settled its claims with plaintiff, whereby a stipulation of

dismissal with prejudice was entered.  (D.I. 114)  The court, noting that plaintiff had

withstood scrutiny through the summary judgment process, referred the matter to the

Federal Civil Panel.  (D.I. 124)  Counsel entered his appearance for plaintiff on July 17,

2008.  (D.I. 125)  Additional discovery was exchanged and depositions were taken.

(D.I. 131,132, 133, 139, 140, 141, 142, 143, 144, 145, 146, 147, 150, 153, 143, 155,

156, 157, 158, 159, 160, 161)

Currently before the court is defendants' motion for summary judgment.  (D.I.

162, 163, 164)  Plaintiff filed his opposition to the motion and moved to strike

defendants' affirmative defense of release pursuant to Fed. R. Civ. P. 12(f).  (D.I. 166,

167)  The matter is fully briefed.  (D.I. 168. 169, 170, 171, 172)  The court has

jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons that follow, defendants'

motion for summary judgment is denied in part and granted in part, and plaintiff's

motion to strike is granted.

2

## II. BACKGROUND

During his incarceration at the Sussex Correctional Institution ("SCI"), plaintiff

was prescribed earplugs by Dr. Roberta Burns ("Burns"), a doctor at SCI for the DOC's

medical provider, FCM. (D.I. 168 at ex. B, 6:20 - 7:2) Burns prescribed earplugs to

keep water out of plaintiff's ears because "(t)he biggest risk in people who have

ruptured ear drums is infection and water in the ear encourages infection . . . probably

the most important thing you can do is to keep water out of the ear." (*Id.* at 9:18-24)

Plaintiff had ruptured eardrums and was hard of hearing. (*Id.* at 26:7-14, ex. I at B-47-

B-50) The risk of chronic infections "can destroy whatever hearing is left." (*Id.* at 26:22-

23) Burns gave plaintiff a medical order authorizing his possession of earplugs. (*Id.* at

9:7-10; 24; ex. I at B-47-48; B-50) Because keeping a pair of earplugs would be an

"exception to the rule" of treating everyone the same in prison, Burns wrote memos to

advise that plaintiff should be wearing earplugs and to ensure that plaintiff was

permitted to keep the earplugs in his cell. (*Id.* at 13:1-24, 18:7-24, 19:3-24)

Correctional staff were given the authorization notes because, as Burns explained,

correctional officers

> did shake downs on a regular basis, went through looking for
> contraband. And sometimes the officers had a tendency to
> confiscate anything that wasn't normal, something that every
> inmate would have. So that anything you gave an inmate,
> you know, an Ace bandage, a knee brace, an ankle brace, a
> cane, crutch earplugs. Any durable piece of equipment that
> you gave an inmate, anything that wasn't a pill that they swallowed,
> went with a memo.

(*Id.* at 21:9-19) Plaintiff kept the earplugs with him, in his cell. (D.I. 164 D0046 at

29:15-20)

3

On July 26, 2002, plaintiff was transferred from SCI to DCC.[4]  (D.I. 164 at

D0036-37) Prior to the transfer, plaintiff packed his earplugs with the rest of his

personal belongings. (D.I. 168, ex. A at 35:2-9, 56:8-15; ex. E at B24-25) Upon arrival

at DCC, plaintiff completed a "Removal of Personal Items" form ("Release"), wherein he

authorized DCC to send his personal belongings to Lillie Jackson. (D.I. 164 at

D00064) The Release, signed by plaintiff, further provided:

> I [plaintiff], do hereby remise, release and forever discharge for myself,
> my successors, assigns, heirs, executors, and administrators, the
> DCC, the DOC, and the State of Delaware, their officers, agents,
> servants, successors, and assigns, of and from all manner of actions,
> suits, debts, dues, accounts, bonds, contracts, agreements, claims,
> and demands whatsoever; in law or in equity which I have not, ever
> had, or may have concerning the handling of my personal property
> in storage at the DCC, and its disposal by the method I have
> selected as listed above.

(*Id.*)

Approximately one week following the transfer, plaintiff received his belongings

after DCC security reviewed the items for contraband.[5]  (D.I. 168, ex. A at 36:20-22)

When he reviewed his belongings, plaintiff discovered his earplugs had been

confiscated. (*Id.* at 36:23-40:20) Plaintiff advised the attending nurse of his need for

earplugs. (*Id.*, Ex. I at B-51)

---

[4]Defendants submitted the policies and procedures related to transfer of
inmates. (D.I. 164 at D00122-160) Due to medical privacy concerns, correctional staff
were permitted to view inmate medical records on a limited basis. (*Id.* at D00125)

[5]In his deposition testimony, defendant Taylor explained that "there are limited
items" that an inmate can possess and "it varies by institution and security level." (D.I.
168, ex. B at 60:7-9) He defined "contraband" as "anything that's not expressly
approved to be in their possession. It's not an exclusionary list. It's only these items
can be present; anything else is contraband." (*Id.* at 59:24-60:4)

On September 25, 2002, plaintiff filled out a sick call slip.[6]  (*Id.*, ex. I at B-53)  He

filled out additional sick call slips, noting problems with his hearing, headaches, and

dizzy spells.  (*Id.* at B-53-54)  Plaintiff was seen by Dr. Nicholas Berg ("Berg") on March

14, 2003.  Berg's medical notes reflect a diagnosis of "chronic otitis media, tympanic

membrane perforation 3c" and that "water precautions" were discussed, with additional

testing ordered and a  follow-up one month later.[7]  (*Id.* at B-65-66)

On April 11, 2003, plaintiff was transferred back to SCI.  (D.I. 164 at D0054)

Plaintiff's hearing problems and ear infections were noted.  (DI 168, ex. I at B-67)  On

April 14, 2003, Burns completed a special needs referral form wherein she identified

plaintiff as having a special need, "profoundly deaf," that would endure during his

incarceration.  (*Id.* at B-52)  On May 20, 2003, Burns gave plaintiff earplugs and a

second medical order authorizing them.  (*Id.* at B-50)  The medical order provided:

> [Plaintiff] has severely perforated eardrums bilaterally.  It
> is very important that he not get any water in his ears.  He has
> been given ear plugs to wear when he showers.  Please permit
> him to keep these and use them.

(*Id.*)

 Approximately one month later, May 22, 2003, plaintiff was transferred once

again to DCC.  (D.I. 164 at D00015-16)  Upon arrival at DCC, plaintiff signed a second

---

[6]Plaintiff wrote, "I'm having problems with my ears and my throat.  My hearing
has deminished (sic) severly (sic).  I'm affraid (sic) I have a very bad infection thats (sic)
spreading to my heard."  A notation on the medical note attached to plaintiff's sick slip
reflects "Rear drum perforated."  (D.I. 168, ex. I at B-53)

[7]In his deposition testimony, Dr. Nicholas Berg stated that earplugs would not
necessarily reduce the risk of water getting into the ear during showering.  (D.I. 164 at
D00165)

Release, virtually identical to the one signed on July 26, 2002. (*Id.* at D00066) When his personal belongings were returned about three weeks later, plaintiff discovered his earplugs had been confiscated for a second time. (D.I. 168, ex. A at 60:6-61; 24)

On May 30, 2003, plaintiff filled out a sick call slip because of an ear infection he had developed. (*Id.*, ex. I at B-57) On June 10, 2003, Dr. Aramburo ("Aramburo") diagnosed plaintiff as having nothing wrong with his ears other than allergies. (*Id.*, ex. A at 62:2-23) Plaintiff filed a grievance the same day.[8] (*Id.*, ex. J at B-68) In the grievance, plaintiff stated that he was a "chronic care inmate" suffering from headaches, dizzy spells related to perforated eardrums and complained that Aramburo was unable to provide the care needed. (*Id.*) During his deposition, plaintiff testified that this grievance was related to his confiscated earplugs. (*Id.*, ex. A at 63:23-64:1; ex. J at B-68) The record does not reflect the outcome of the grievance.

On August 10, 2003, plaintiff filed another grievance regarding his ear problems and medical care. (*Id.* at ex. J at B-69) On August 18, 2003, the grievance was characterized as

> resolved. If you have further issues, please submit a sick call request.
> You were seen by an outside ENT consult on March 17, 2003.
> The report is on your medical record. I will schedule you
> with a medical provider to review the report.

(*Id.*, ex. J at B-70) Plaintiff appealed this decision; the record does not reflect that this appeal was ever addressed. (*Id.* at B-71)

---

[8]Plaintiff submitted a copy of this grievance in his opposing papers. (D.I. 168, ex. J, B-68)

On October 18, 2003, plaintiff filed two additional grievances, one dealing with his ear problems and treatment and the other with the confiscation of his earplugs. (*Id.* at B-72) Specifically, plaintiff explained that, "DOC keeps confiscating my earplugs that were prescribed by Dr. Burns of FCM while I was at SCI." (*Id.* at B-73) Plaintiff requested that the earplugs be re-issued and that he be allowed to possess them. On November 12, 2003, plaintiff filed the instant action.

Plaintiff subsequently filed two additional grievances, December 3 and December 19, 2003.[9] (D.I. 168, ex. J at B-74, B-75-76) In the first grievance, plaintiff complains of persistent problems with his ears and requests an appointment with a specialist, or the chance to obtain his own treatment. (*Id.*, ex. J at B-74) In the second grievance, plaintiff complains of "not getting proper medical treatment for [his] chronic, continued loss of hearing, discharge from the ears, ringing in the ears etc . . . " (*Id.* at B-75) He requests, in part, an appointment with a specialist. The "informal resolution" form reflects that, on January 6, 2004, plaintiff was told that an appointment for consultation with a specialist would be scheduled. (*Id.* at B-78) Plaintiff refused to sign this form. (*Id.*) At his deposition, plaintiff explained his refusal to sign as follows:

> Like I filed a grievance about not going to the ENT specialist or like not having no earplugs. They wanted me to sign off on it, but I still don't have the earplugs. I still haven't seen the doctor, the ENT specialist. But they want me to sign off on the grievance. You know what I mean. They want me to sign the resolution, but the issue has not been resolved. You know what I mean. They ask me to sign off on it, but the issue was never resolved. So I won't sign it.

---

[9]Defendants did not submit these grievances in support of their summary judgment motion. Plaintiff has provided the court with the grievances.

(D.I. 164 at D00058 at 76:20-77:4)

The December 3, 2003 grievance was characterized as informally resolved on

April 12, 2004, as follows: "Will attempt to get earplugs. If not cotton balls for showers.

Will be scheduled for hearing aid evaluation." (Dl. 168, ex. J at B-81)

According to Lise Merson, a DOC corporal at DCC whose responsibilities include

processing inmate grievances and maintaining grievance files and logs, there are no

records of any grievances filed at DCC or "from [plaintiff] relating to confiscation of his

earplugs upon his transfer" in July 2002 and May 2003. (D.I. 164 at D00068) Further,

> [w]hile there were numerous grievances filed by [plaintiff] during this
> time period about his dissatisfaction with the medical treatment he
> was receiving, there was only one grievance dated October 18, 2003
> relating to earplugs. In that one grievance, [plaintiff] stated that 'DOC
> keeps confiscating my earplugs that were prescribed by Dr. Burns of
> FCM while I was at SCI.' A grievance decision was rendered at DCC
> on December 20, 2003, with [plaintiff] being advised that Dr. Alie
> denied the request for earplugs on November 18, 2003. [Plaintiff] did
> not appeal that decision.
>
> The inmate grievance procedure in place at the [DCC] at all times
> relevant to the instant case requires that the grievant submit a grievance
> form within seven (7) calendar days following the incident. While
> [plaintiff] never filed a grievance regarding his confiscated earplugs
> upon his arrival at this institution, the grievance should have been filed
> within 7 days of the alleged confiscation(s).
>
> The inmate grievance procedure defines a grievance as 'a written complaint
> concerning the substance or application of a policy or practice; any action
> toward an inmate by staff or other inmates; any condition or incident within
> the institution that affects an inmate.' Complaints specifically excluded
> from the inmate grievance process are those concerning Disciplinary,
> Classification action, and Parole Board decisions, because they have
> their own formal appeal mechanisms, complaints containing vulgar/abusive
> or threatening language, requests, duplicate grievances, photocopies,
> and inquiries on behalf of other inmates.

(*Id.*)

8

Contemporaneous to the dates at issue, members of the Medical Audit Committee ("MAC") met monthly to discuss and solve problems, among other matters, policy, grievance trends and staffing issues. (D.I. 168, ex. C at 17:22-23; 20:1-18, 22:13-23)  MAC was composed of members of DCC and FCM, including defendant Carroll. At a March 19, 2003 meeting, the committee discussed "[q]uestions [ ] brought up regarding all the memos that are being written from medical and mental health to security." (*Id.* at ex. L at B-100)  Further, a "new process needs to be put in place. The providers need to let the inmates know that even though memos are written, they may be denied by security or a medical director." (*Id.*)

At the next meeting where the memo issue was again addressed, defendant Carroll "suggested that a new policy be written. [He] suggested that the memos could be countersigned by Dr. Alie but still are at the approval of security staff." (*Id.* at B-109)  The record does not reflect any follow-up at subsequent meetings.[10]

## III.  STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  When determining whether a genuine issue of material fact exists, the court must view the

---

[10]DOC currently has a policy for continuity of care, including medical treatment plans. (D.I. 168, Ex. n at B-146, B-153-54)

9

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Indeed, to survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Defendants move for summary judgment on three grounds:  (1) the Releases signed by plaintiff bar claims against the DOC and its employees from liability in

10

connection with the handling of his personal property; (2) there are no remaining claims because liability for a custom or policy that demonstrates deliberate indifference is not applicable to defendants; and (3) plaintiff failed to exhaust administration remedies prior to filing suit. (D.I. 163)

In response, plaintiff moved to strike defendant's release argument on the grounds that he is prejudiced by defendants' untimely presentation of this defense. (D.I. 167) Plaintiff further asserts that there are issues of material fact that preclude summary judgment with respect to defendants' liability for defective policies and procedures and defendants have not carried their burden of demonstrating that plaintiff failed to exhaust administrative remedies.

## IV. DISCUSSION

### A. Release

Release is an affirmative defense that must be raised in the answer or a responsive pleading. Fed. R. Civ. P. 8(b), (c). Defendants raised the release defense for the first time in their motion for summary judgment, denying it was untimely because plaintiff did not allege confiscation of the earplugs as a cause of action until February 2009. (D.I. 171) They further aver that several of plaintiff's pleadings reflect dissatisfaction with medical personnel rather than problems with correctional personnel taking his earplugs. Plaintiff submits that the defense is untimely and prejudice will result if it is permitted.

Having reviewed the entire record, it is evident that plaintiff has consistently complained about the medical care and treatment provided for his ear problems.

11

Included within these general claims are references to the confiscation of his earplugs.

The court recognized as much in July 2004 when denying defendants' motion for

summary judgment: "There is evidence that prison officials ignored plaintiff's need for

earplugs, despite memoranda from physicians stating that earplugs were a necessity."

(D.I. 32 at ¶ 121) Significantly, defendants recognized the parameters of plaintiff's

claims at least by September 8, 2005 in yet another motion practice:

> Plaintiff's sole complaint against [defendants] is that, when he arrived
> at DCC on two separate occasions, his earplugs were confiscated and
> never returned to him. However, there is no evidence in the record that
> Plaintiff arrived at DCC with earplugs. The relevant documentation
> indicates that he did not arrive with earplugs.
> In the absence of any evidence that plaintiff's earplugs were confiscated,
> there is no material factual dispute.

(D.I. 101 at 7) (emphasis and citations omitted) The court finds that the record does

not support permitting defendants to assert the defense of release at this stage in the

proceedings and the motion to strike is granted. *See Eddy v. Virgin Is. Water & Power*

*Auth.* 256 F.3d 204, 210 (3d Cir. 2001); *Charpentier v. Godsil*, 937 F.2d 859, 863-64

(3d Cir. 1991).

Alternatively, even if the release defense were not stricken, the court finds that

summary judgment on this issue is inappropriate because defendants have not

demonstrated that the Releases executed were valid. A release is a contract and

construction of contract language is a question of law. *Pellaton v. Bank of New York*,

592 A.2d 473, 478 (Del. 1991). "The primary consideration in interpreting a release is

to give effect to the intent of the parties at the time they contracted, and the court will

attempt to determine intent from the overall language of the release." *Fox v. Rodel,*

*Inc.*, 1999 WL 588293 (D. Del. July 14, 1999). "The formation of a contract requires a

12

bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Wood v. State*, 2003 WL 168455, at *2 (Del. Supr. Jan . 23, 2003). "[C]onsideration is defined as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request." *Continental Ins. Co. v. Rutledge* & Co., 750 A.2d 1219, 1231 (Del. Ch. 2000). Waiver cannot be presumed from a silent record. Waiver must be knowingly and intelligently made. *Richardson v. United States*, 558 F.3d 216, 221-222 (3d Cir. 2009).

The record reflects that plaintiff signed two Releases, July 26, 2002 and May 22, 2003, respectively, upon arrival at DCC. Both forms are virtually identical, save for the differing dates and identification material filled in the blanks. These generic forms were presumably prepared by or on behalf of DCC with no input by plaintiff. In fact, there is no space even to describe the specific personal property at issue. A plain reading of the forms suggests the purpose is for transferring and disposing of personal property and protecting defendants if disposal is done improperly, negligently or carelessly.

While the Releases may prevent plaintiff from suing for disposing of his personal property in a manner different than his chosen method, they do not have the much broader effect  of protecting defendants from the claims herein. A plain reading of plaintiff's complaint makes clear that he sought relief for the injuries suffered as a result of the denial of medical care and, relatedly, the confiscation of his earplugs. The complaint does not contest the disposal of his personal property.

Moreover, plaintiff cannot be deemed to have relinquished his Constitutional rights absent a clear and knowing waiver. *Richardson v. United States*, 558 F.3d 216, 221 (3d Cir. 2009). The record is silent in this regard. *Carnley v. Cochran*, 369 U.S.

506, 516 (1962). There is no evidence that plaintiff knowingly or voluntarily signed the form with the understanding that he was forfeiting his right to bring suit pursuant to 42 U.S.C. §1983 .

There is also no evidence of record establishing that plaintiff received any valuable consideration for releasing claims for improperly disposed of property, let alone claims for injury stemming from a deprivation of Constitutional rights. Nothing has been presented to refute the understanding that inmates are required to sign the forms upon entry in DCC, but receive nothing in return. The only choice an inmate has relates to which method he wishes DCC to use for safe-keeping confiscated property. Accordingly, no valuable consideration was contemplated by the parties or received by plaintiff.

## B. Supervisory Liability

Plaintiff asserts that the policy in place, during the relevant time period, did not address communication or coordination between medical and security personnel regarding inmates with medical goods properly in their possession and, consequently, anything that was not expressly approved to be in their possession was confiscated as contraband. Defendants contend that liability for a custom or policy that demonstrates deliberate indifference is not applicable because they are immune from liability under the Eleventh Amendment of the United States Constitution. They further submit that plaintiff has not demonstrated that the earplugs were a medical necessity and, instead,

14

there was a disagreement between medical personnel over equally appropriate forms of treatment.[11]

As discussed above, because the court has previously addressed defendants' motions for summary judgment, the issue of supervisory liability has been narrowed. *See infra* p. 3. It is well-established that § 1983 actions for compensatory and punitive monetary damages against a state, or state official in his official capacity, are barred by the Eleventh Amendment. *Will v. Michigan Department of State Police*, 491 U.S. 58, 69 (1989) (holding that neither state, nor state officials sued in their official capacities for money damages are "persons" within the meaning of § 1983); *see Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). "When state officials are sued in their individual capacity, the Eleventh Amendment does not bar damage suits against them for deprivations of federal rights caused by those officials acting under color of state law." *Sample v. Diecks,* 885 F.2d 1099, 1112 (1989).

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). To set forth a cognizable claim, an inmate must prove (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Id.* at 104. The inmate must show, objectively, that he has a serious medical need and show, subjectively, that the prison

---

[11]To the extent defendants contend that the existence of conflicting medical opinions regarding the need for earplugs negates any liability for confiscation of said earplugs, the court finds this argument unavailing. Defendants have not presented any evidence to demonstrate that the earplugs were confiscated because there was a difference in medical opinion over the need for earplugs. The record does not suggest that the confiscation was related to any medical purpose.

15

official acted with deliberate indifference to that serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Beers-Capital v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001).

In order to "hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001). The plaintiff must further demonstrate that: "(1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Id. (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989))*. This four-part test is "simply the deliberate indifference test applied to the specific situation of a policymaker." *Id.* at 135. The absence of a policy or failure to establish a policy can give rise to liability. *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003).

Defendants have not addressed this standard and, therefore, have not carried their burden to warrant summary judgment. The court notes in this regard, however, that the earplugs were prescribed by a doctor, the DOC was appropriately notified of the prescription, the record is devoid of any evidence that the earplugs were confiscated for legitimate medical or security reasons or pursuant to a policy addressing such reasons, and plaintiff suffered medical consequences.

## C. Exhaustion of Administrative Remedies

16

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. 199 (2007). Failure to exhaust administrative remedies must be pled and proved by the defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). "'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)).

As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint are not required by the PLRA. *Woodford*, 548

17

U.S. at 95. The PLRA does not require the grievance and complaint to be identical because inmates are required to complete the applicable administrative process (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. *See Booth v. Churner*, 532 U.S. at 746.

The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill v. Gillis*, 372 F.3d at 227-28; *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d. Cir. 2000); *but see Freeman v. Snyder,* No. 98-636-GMS, 2001 WL 515258, at \*7 (D. Del. Apr. 10, 2001) (finding that if no administrative remedy is available, the exhaustion requirement need not be met). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002).

The record reflects that plaintiff did not file a grievance with respect to the first confiscation of earplugs in 2002, accordingly, this claim was procedurally defaulted. The record is less clear, however, with respect to the second confiscation of earplugs in 2003. It is uncontested that defendants bear the burden of demonstrating that plaintiff failed to exhaust administrative remedies. Although defendants have presented some documentation in support of procedural default, they have failed to present all of the grievances filed, the resolution of the grievances, or the pertinent policy regarding the appeal process.

Further, there is an issue of fact at to whether plaintiff's June 10, 2003 grievance was timely. Defendants submit that plaintiff procedurally defaulted on the claim

18

because he did not file a grievance within seven days of his May 22, 2003 transfer. The issue, however, is not the date of plaintiff's transfer, but the confiscation of the earplugs that occurred as part of his transfer.

It is unrefuted that plaintiff was transferred to DCC on May 22, 2003 and that he did not receive his property until three weeks later. The exact date plaintiff received his property and thus discovered the confiscation of the earplugs is unclear. The record reflects that plaintiff filed a grievance on June 10, 2003 , related to Aramburo's treatment. Plaintiff testified that this grievance also related to his confiscated earplugs. This grievance would fall within the three week time frame where plaintiff received his property. Cpl. Merson's affidavit testimony, however, indicates the only grievance related to earplugs was filed on October 18, 2003. Accordingly, this is an issue of material fact for the jury.

## V. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted in part and denied in part. (D.I. 162) Plaintiff's motion to strike is granted. (D.I. 166) An appropriate order shall issue.